FILED

04/28/2017

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 3, 2017

## IN RE RIVER C.

**Appeal from the Juvenile Court for Hamilton County**
**No. 269,305      Robert D. Philyaw, Judge**

---

### No. E2016-02407-COA-R3-PT

---

Justin C. ("Father") appeals the order of the Juvenile Court for Hamilton County ("the Juvenile Court") terminating his parental rights to the minor child River C. ("the Child") on the ground of abandonment by wanton disregard pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv) and the ground of substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2).  We find and hold that clear and convincing evidence was proven that grounds existed to terminate Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-113(g)(2) and that it was proven by clear and convincing evidence that the termination was in the Child's best interest.  We, therefore, affirm the judgment of the Juvenile Court terminating Father's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

Jason A. Fisher, Chattanooga, Tennessee, for the appellant, Justin C.

Herbert H. Slatery, III, Attorney General and Reporter; and W. Derek Green, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

Berry Foster, Chattanooga, Tennessee, Guardian ad Litem.

## OPINION

## Background

The Child was taken into State custody on December 19, 2014, and was adjudicated dependent and neglected on May 27, 2015. The Child was approximately six months old when he entered State custody. The State of Tennessee Department of Children's Services ("DCS") filed its petition seeking to terminate Father's and Mother's[1] parental rights to the Child on December 11, 2015 ("the Petition"). The case was tried over several days in August and September of 2016. The Child was two years old at the time of trial.

At the time of trial, Father was incarcerated in the Bradley County jail where he had been for a little over 90 days. Father participated in the trial by telephone. Prior to his incarceration in the Bradley County jail, Father had been incarcerated in the Hamilton County jail. His incarceration in the Hamilton County jail began in November of 2015, and lasted approximately 70 days.

Father also was incarcerated at the time that DCS filed the Petition. Father testified that he had been charged with felony evading, assault, and theft of property. Father stated that he could not remember all of the offenses with which he had been charged. Father admitted that one of the charges was for possession of methamphetamine. Father pled guilty and has been sentenced on those charges. He stated that he "received six years on enhanced state probation with also a GPS monitor and a 6:00 to 6:00 curfew."

Father testified that he recently was sentenced to four years in Cleveland, Tennessee for violating probation on the underlying charges of simple burglary and theft of property, which he incurred in 2010. Father admitted that he has had convictions in Hamilton County General Sessions Court after the Child was taken into State custody.

Father admitted that he was convicted in 2006 in Georgia of felony possession of marijuana and felony manufacture of marijuana. In 2013, Father was charged in Walker County with DUI, possession of marijuana and driving on a suspended license. He received 24 months suspended sentence and was put on probation for these offenses. Father stated that he was not on parole in Georgia when he incurred the charges in Hamilton County because he had violated his parole earlier and been sentenced in Georgia where he served nine months. Father could not remember the dates he served

---

[1] Mother did not appeal the termination of her parental rights to the Child.

time in Georgia, but stated that it was from December of 2013, until June, July, or August of 2014.

Father admitted that he was charged with driving on a revoked license in November of 2014. Father was put on probation for that offense. Father stated that "was prior to [the Child] being taken from the home." In January of 2015, Father was charged with DUI. He served 60 days on that charge. In May of 2015, Father was charged with unauthorized use of an automobile or joyriding. He served six months on that charge.

The Child was taken into State custody on December 19, 2014. Since the Child was taken into custody Father has been out of incarceration for only 80 or 90 days. Father stated: "About somewhere. I mean, I haven't been out over four months on the streets."

When asked about the circumstances of how the Child entered State custody, Father stated:

> They come out to the home. At the time, I wasn't doing no drugs. The woman said that - - or they come out there and said there was a disturbance or something. And whenever they was approached the home, they totally surrounded the house, and all that. Whenever they come in the house, they said that there was meth being cooked.
>
> There was no meth being cooked at the home. When they searched, they found some material that, I guess - - I didn't have no knowledge that it was even there . . . .

Mother was arrested. Father stated that Mother admitted ownership of the methamphetamine materials. Father testified that he was not arrested on that day.

Father stated that after the Child was taken into State custody the Child was placed with Father's first cousin, John M., and his cousin's wife, Brandie M. (collectively "his Cousins"). Father stated that the Child has not been in his Cousins' home the entire time that he has been in State custody. Father testified:

> He was taken out of their home at one time. In the beginning, he went to another foster care home, and then he went into John and Brandie's home, and then there was some allegations or something that was said and [the Child] was tooken out of their home but placed back into their home.

-3-

Father is aware that his Cousins want to adopt the Child. He stated that he is not in agreement with this adoption. Father stated: "If my rights was to be terminated, I would - - I would be in agreement of it. But, if not, I would like to be able to, whenever I get released from custody, to pursue to be able to get my rights back to my son." Father was asked why he didn't want his Cousins to adopt the Child, and he stated:

> I would like to be able to pursue custody at the time of my release. I mean, I know that it has been a significant amount of time and there have been numerous things that has went on.

> But, you know, I ask for mercy of the Court to accept that, you know, I am going through - - I mean, I was going to be released from here on - - if I had been released on the 5th from here, I was going to go straight to CADAS and admitted into CADAS and go to Joe Johnson, was going to admit into Joe Johnson to get all that taken care of.

> I got my home, but I just needed to find a job and get that squared away. Other than that, you know, I know that there's a lot of things that has happened.

Father stated that he has nine more months to serve in Bradley County. Father admitted that he previously had stated that he would be released by the time of trial, but that did not happen. Father insisted, however, that he would be out in less than a year.

Father was asked when he last saw the Child, and he stated: "2014 - - or 2015." Father could not recall the month, and he stated: "I've been incarcerated a lot." Father was asked if he beleved that the Child still remembered him, and he stated: "I would say so."

Father testified that his plan is to live with his fiancée when he is released. Father has been involved in a relationship with his fiancée since September of 2015. He testified that they have been engaged since October of 2015, which was shortly before Father's current incarceration. When asked about his fiancée, Father stated:

> She's - - [my fiancée], she runs RT Cycles. She has a master's associate's in accounting. She works at Stone Source in Hamilton County off of Broad Street as a sec - - not a secretary, but accountant. She does the accounting for her mother and father's shop, RT Cycles.

> She's owned her home for approximately 15 years. She's never had no criminal charges or anything criminal. She doesn't do drugs.

Father is not in contact with Mother and does not know where she is living. Father stated that the last he knew was that Mother was "in some mental health evaluation or hospital that was in Georgia called Out Of Darkness."

Father was asked if he was doing drugs prior to his incarceration in November of 2015, and he stated: "No, ma'am, the drugs was Alicia Boles (phonetic) that was in the vehicle, and no one - - and she wouldn't take ownership of it, and they released her and arrested me." When questioned further Father admitted that he had someone in the car who had drugs on them. Father stated that the Child was not in the car with them at that time, but was at his Cousins' home.

Father admitted receiving a copy of the Permanency Plan created for the Child ("the Permanency Plan") and also admitted that DCS had reviewed the plan with him. Father stated that he did recall signing a Permanency Plan after the Child was taken into State custody. Father admitted that he knew what his responsibilities were under the Permanency Plan. He stated: "I was supposed to go through the mental health evaluation, drug assessment evaluation, a stable job, stable living, and take care of all legal matters that I had going." Father was asked if he had accomplished any of the tasks on the Permanency Plan, and he stated: "Did I accomplish anything on the plan? No, ma'am." He stated: "Once [the Child] was taken out of my - - out of the home - - [the Child] didn't want for nothing. I worked every day. And when [the Child] was taken out of the home, I lost any and all care of life, really." Father was asked if he had taken advantage of any of the services or classes offered while he was incarcerated so that he could work on the tasks on the Permanency Plan, and he stated: "I tried to, ma'am, but they said I didn't have enough time." Father admitted that he didn't do anything while incarcerated.

Father stated he was "100 percent sober" and that the last time he used drugs was in January of 2015. Father was asked why he asserted that things would be different when he was released from incarceration, and he stated:

> Well, you know, I have lived a life of not the most righteous life. The one thing I have been trying to do this whole time, I have been trying to make amends with anybody and everybody that I have ever hurt mentally, physically, or emotionally, and that goes with [the Child] also.
>
> I wrote my kids a letter with Leanne. I wrote Leanne a letter. And I just want forgiveness from people, you know because I've spent - - I'm 30 years old. I've spent over three-quarters of my adult life in incarceration. I'm tired of it.

Father testified that he has converted to Christianity. He stated:

> I stay in my word. I pray every night and every morning whenever I get up. I go to church whenever they attend them here in the jail and in Hamilton County when I was there. You know, I just want to be able to - - for my soul to be at rest because my soul is filled with failure.
>
> My heart and mind is at peace with God, but my soul is filled with failure. I failed my children. I failed my mother. I failed my father.

Father testified that his fiancée also is a Christian. Father did not know to which church his fiancée belonged.

Father was asked if he had any idea where he will be working upon his release from incarceration, and he stated that he would work at Totts Remodeling doing construction. Father stated that his family members have talked to the boss at Totts Remodeling, but Father has not yet spoken with him.

Father agreed that the Child has been in State custody for 599 days. Father agreed that if he is released in nine months, as he asserted he would be, the Child still would be in State custody for a total of around 869 days. Father was asked if it was fair that the Child would not have seen Father for two or three months of 2015, the entire year of 2016, and the first five months of 2017, assuming that Father is released when he asserts he will be. Father stated: "No, it isn't fair to him, Your Honor - - or sir." Father then stated: "It would be in the best interest for a son to be raised by his biological father. That's what I would like to be able to be explained to him." Father insisted that the Child "might not completely remember me, but he will remember me."

Father admitted that the Child has formed a bond with his foster parents. Father stated:

> Yes, I'm sure he has [formed a bond with them]. That is - - I mean, that is one of his family members. And why they ever even put a - - the State made them where my son could just be in the custody of one of his family members, they made them go to adoption against me. But I didn't fail a drug test on December 19th, 2014.

Father agreed that the Child most likely refers to his foster father as daddy. Father stated: "But he isn't the father. He isn't - - he might be playing daddy, but he isn't the father of [the Child]."

The Child's foster mother, Brandie M. ("Foster Mom"), testified at trial. Foster Mom explained that her husband ("Foster Dad") is Father's cousin. The Child entered their home on January 2, 2015. Foster Mom and her husband do not have any other children.

Foster Mom testified that the Child has not been in her home continuously since that time, and she further explained:

> There was a one-week break where he was removed from the home due to some miscommunications with two different caseworkers, our home worker, our resource parent worker, and the home study worker. Unfortunately, they were asking different questions and, of course, getting different answers. And so, although it was essentially the same question, it was phrased differently. And once we had a child and family team meeting to clear all of that up, we were able to pick [the Child] up that day.

The Child was six months old when he entered the foster home. Foster Mom was asked what the Child was like when he entered their home, and she stated: "Healthy, happy. He did come to us with a double ear infection, and that was recurring throughout that winter, but since then, we've not had any issues. He didn't seem to have any attachment issues. Everything was as normal as you could ask for." Foster Mom was asked if the Child was meeting his developmental milestones, and she stated: "He's actually exceeding most of his milestones."

Foster Mom testified that they received occasional phone calls and text messages from Father and Mother when the Child first entered their home. She stated: "But those stopped relatively early on." Father last saw the Child on January 14, 2015, and they received two phone calls from him after that time. Foster Mom testified that the Child is bonded to her and her husband. The Child calls her 'Momma' and her husband 'Dadda.' As far as Foster Mom is aware, the Child could not identify Father if he saw him.

Foster Mom testified that she and her husband never have had a close relationship with Father. She was asked about their relationship with Father's mother, and she stated:

> She's been very helpful with [the Child] in helping to make sure that we are able to meet all of his needs. She's provided far more than she ever needed to for him. We speak on at least a weekly basis, if not every couple of days. She checks in to see how [the Child's] doing, how school is going, health-wise.

-7-

She's attended every function that we've had for him. She actually held his last birthday party for us. She's - - we have definitely grown closer since [the Child] came into our home. . . . She really likes to go shopping for him. She's all the time bringing clothes or toys. She actually asked me in the waiting room earlier about a toy that she found, to see if I thought he would like it so that she could go buy it today.

When asked about the Child's relationship with other family members, Foster Mom stated:

My family has taken him in as one of their own. My parents love him very much, as does my brother. All my familly has welcomed him with open arms. All of John's family and, in turn, [Father's] family is very close with him.

We actually, with DCS permission, took him down to Florida to see [Father's] brother and his wife and nephew back in May so that he could begin to form a relationship with them and more than just a telephone kind of relationship.

He's absolutely bonded with everyone that he's come in contact with. He's a very friendly, loving child.

Foster Mom testified that Father has other children and that she and her husband have facilitated a relationship between the Child and Father's other children. Foster Mom explained:

Over the past several months, the other mother has agreed to allow the other children to know who [the Child] is as their brother. And so we've gotten them together quite a few times at the grandmother's, [Father's mother's], house.

We were at a family reunion with them at one point. They have been slowly developing a relationship and I think it's been very healthy for all four of them. There are three other children and [the Child]. And [the Child's] been very, very excited about brothers and sister. He asks for them quite frequently, actually.

The Child is enrolled in a daycare close to where Foster Mom works. Foster Mom testified that she could be at the daycare "within about five minutes." When asked how the Child was doing in daycare, Foster Mom stated:

Wonderfully. He's - - I think they're a good part of how he has managed to exceed so many of his milestones[.] He can count to 12 almost every single time by himself, with no help whatsoever. He's just turned two. He knows his ABCs. He can identify them all, capital, and most of them lowercase. He's pretty impressive, actually. We're definitely supporters of our day care.

Foster Mom testified that she and her husband want to adopt the Child if he becomes available for adoption. When asked if she and her husband could provide for the Child financially, Foster Mom stated: "Without a doubt." Foster Mom was asked if DCS had pushed them to adopt, and she stated:

Nobody has pushed it. If rights are terminated, we would be more than happy to adopt [the Child]. He's been with us now for a year and a half. We consider him a part of our family more so than just a cousin. We're absolutely in love with him and would gladly adopt him.

Foster Mom was asked if adoption were allowed would they allow Father to have contact with the Child in the future, and she stated:

That is completely up to [Father] and [Father's] behavior. We don't have any problem with [the Child] knowing who [Father] is. He knows all of [Father's] family. He deserves to know where he came from, and he deserves to know his family.

But if he's on drugs and he is in and out of jail, that's not the type of influence that I would want on any child, and I don't think it's fair to [the Child] to expose him to that type of behavior.

Foster Mom was asked why she and her husband don't just continue to keep the Child as a cousin instead of adopting, and she stated:

I think mostly because that feels like he's in limbo and he doesn't have permanency. If he's just living with someone else, whether it be us or his grandmother or anybody else who has custody of him, then there is always a question of what could happen with him: Will his parents show up and decide they want to play mom and dad now? And so they're going to clean up their act for a couple of months and take him back and disrupt his life and turn his world upside down because now he's been taken from the only thing he's ever known, the only thing he has any memory of?

And they've both shown a lot of recidivism. It's not fair to him to have that in question, whether or not he's going to have that stability.

I would hope that [Father] and [Mother] had both learned their lesson just by [the Child] being taken out of the home. I expected for this to be a very temporary thing and him to go back home within a month or two. But neither of them have shown any interest in turning their lives around.

And it's just not fair to him to be in limbo like that. I want him to have the permanency. I want him to know that he's got a family who loves him and wants to do right by him.

And if they want to do right by theirselves, then they can still be a part of his life. But until they can take care of theirselves, there is no way they can take care of him.

Based upon her observation of the Child, Foster Mom was asked what type of impact it might have upon him if he were removed from their custody, and she stated:

Based on the week that he was away from us, he was around nine months old at the time, so I would think that his reaction would be a lot stronger and of the same type, with the attachment-type issues, the crying.

I know the foster parent that he was with for that week. We've actually since met and become friends through the foster parent conferences and things like that. At the time, she was sending me text messages telling me that he was okay, trying to keep me from worrying, but, after the fact, she told me that he was having some difficulty eating, he was having trouble sleeping.

He's a baby. Still at two, he is a baby. He doesn't understand when somebody's gone. He just knows that they are gone. And I have seen how he acts when my husband goes outside without him. And I'm afraid of long-term consequences if he were moved at this point, because, even at two years old, they don't understand why something is happening, but they still have feelings that that [sic] they can't process. And I don't think that it would be a positive reaction at all.

Foster Mom was asked how things have gone having the Child in her household, and she stated:

> Other than the one week that he was moved, very well. He adjusted very quickly.
>
> After he was moved, we had a little bit of an issue with some separation anxiety because he was always afraid we were going to hand him off to somebody again. It took several months for him to recover from that. He would wake up in the middle of the night screaming, and he couldn't be comforted until he saw or heard one of us. And as soon as he knew that he was still with us, he would go right back to sleep.
>
> But, other than that, he's progressing wonderfully. He's exceeding all of his milestones. You heard me say that he could already say and identify his ABCs and can count to 12. Occasionally, he counts to 20. He'll miss a couple here and there, but he's two, and that is incredibly impressive. He's smarter than his own good. (Laughing.) He's great.

Betty S. ("Grandmother") is the Child's paternal grandmother. Grandmother testified that she spoke with Father approximately four days before trial. Grandmother was asked what they spoke about, and she stated that Father said: "Mom, they gave me four years. They gave me 19 months of credit. I'll be out in about a year. Can you put money on my book?" Grandmother speaks to Father about once every other week or once a month.

Grandmother testified that she was not aware that Father has a fiancée. She stated that Father has mentioned the woman he testified was his fiancée, but stated that Father still was married to another woman. Grandmother testified that Father has three children with his wife. Father does not have a relationship with these three children. Grandmother also testified that Father does not have a relationship with the Child. Father never asks Grandmother how the Child is doing. Father also never asks Grandmother about how his other children are doing.

Grandmother was asked what her relationship with the Child was like, and she stated: "Great, as always. I mean, I play with him. We play games. We play - - we go to the swimming pool. He comes and he eat [sic] crackers at Nana's house. He calls me Nana Betty Jo. He's just a wonderful baby. He's very well-adjusted."

Grandmother testified that she paid all of the bills when Father, Mother, and the Child lived with her. Father never contributed toward the household expenses.

Grandmother testified that Father never has paid child support. Grandmother was asked if Father ever maintained employment, and she stated:

> He says that he has his own business, which is he had a central heating and air company, but it's not the truth. You know, yes, he goes and does changes out here and there, but it's nothing consistent. It's not a weekly job.
>
> He'll make money, then he goes and blows money, and then he goes and makes money, then he blows money.

Grandmother also was asked if Father ever had stable housing, and she stated: "If he's living with someone, like me or his wife." Grandmother stated that Father's wife left him when he went to prison approximately six years ago. When asked if she would say that Father has made any adjustment to his circumstances since the Child was taken into custody Grandmother stated: "No. I mean, he's went further downhill. He's got into more trouble and more trouble and more trouble." Grandmother is concerned that if the Child were placed into Father's home that the Child would "be right back in DCS custody within 90 days." Grandmother testified that the Child was doing "[e]xtremely" well in the foster home, and that he was "[v]ery" smart and was happy and healthy.

Grandmother wrote a letter to DCS, and she was asked why she wrote the letter. She stated: "[the Child] being in DCS custody has really taken a toll on me health-wise because I know my son and he's not going to change, and I want this over, and I want [the Child] to be able to have stability and consistency and being stable in his home." Grandmother understands that she no longer will be the Child's grandmother if Father's parental rights are terminated, but she stated: "but I'll always be his nana." Grandmother understands that if the foster parents adopt the Child that they could decide to prevent her from having contact with the Child, but she still believes that allowing the foster parents to adopt would be "[e]xtremely so" in the best interest of the Child. Grandmother agreed that she is testifying out of her concern for the wellbeing of the Child. She stated: "My grandson don't have a voice. He's two. I want the best for my grandson, and that's John and Brandie. I love my son, and he's the fun side of being a parent, but he's not the responsible side of being a parent."

Tajuana Mitchell[2] ("T. Mitchell") is a team leader for DCS who has supervised the caseworkers assigned to the Child's case. T. Mitchell testified that she is "into [her] thirty-second year" with DCS. T. Mitchell became involved in the Child's case when he

---

[2] Both Tajuana Mitchell and Connee Mitchell from DCS testified in this case. For ease of reference, and to minimize confusion, we refer in this Opinion to these witnesses as 'T. Mitchell' and 'C. Mitchell' respectively.

first was taken into custody.  She testified that she sees the Child at least monthly, and most months she sees him two or three times during the month.  T. Mitchell has attended child and family team meetings for the Child.

T. Mitchell stated that when the Child first entered custody:

I was very optimistic about [Mother] and [Father] because [Father], you know, he articulated in a fashion that he wanted his child and he wanted to do what was in the best interest of the child, and he wanted to try to get himself together.  At that point, he was with [Mother].  Back when the child was removed, he was with [Mother].  And he wanted them together to get their, you know, problems worked out so that they could raise the child.

T. Mitchell testified that she was present when the first Permancy Plan was developed, and both Mother and Father were present.  T. Mitchell stated that after that it was "probably close to ten months before [she] saw the father again."  She could not recall Father and Mother participating in any of the subsequent Permanency Plan meetings.  T. Mitchell testified that the consequences for failure to comply with the Permanency Plan were explained in detail to Father.

T. Mitchell testified that she has observed the Child in the foster home "[a]t least 20 times."  When asked how the Child is doing in the foster home, she stated:

He's very happy.  He's very comfortable.  He's very territorial.  He knows who I am.  He's very familiar with me.  Even when he sees me there, when I go to see him at his day care, when he sees me, he's just like he drops everything and comes, you know, like "She's mine.  She's a part of me."

But anyway, he's very loving.  He's very happy.  One thing I can say, when I - - even if I'm at the day care and I have him and [Foster Mom] comes, he'll just forget all about me, and just, you know, it's all about [Foster Mom].  You know, I kind of - - but anyway, they have - - it's a wonderful relationship.

Even with John, I saw John, they have a farm, and [the Child] is very - - you know, they introduce him to a lot of things.  They introduce him to nature.  They introduce him to animals.  They take him to the zoo.  They've got pictures.  I've got more pictures of [the Child] than I have of my own grandchildren.  They just - - you know, I'm just amazed at how much love

he receives from them. I'm very happy and satisfied with what I see, the type of treatment that I see [the foster parents] are giving [the Child].

T. Mitchell has not seen any progress on Father's part that would cause her to recommend that custody of the Child be placed back with Father. In her opinion Father has not changed his circumstances to make it appropriate for the Child to be returned to him.

Connee Mitchell ("C. Mitchell") is a family service worker two with DCS. She has been employed by DCS for over 17 years. C. Mitchell began working on the Child's case on February 16, 2016. C. Mitchell was asked about meeting Father, and she stated:

I met [Father] [on May 17, 2016] when he was at Bradley County jail, and I went to the jail to present the permanency plan to him, and I went over the permanency plan with him as well as all of the Department's documentation, releases, the HIPAA information, all those documentations, so that he could sign, and to go over that information with him.

C. Mitchell testified that under the Permanency Plan Father was to accomplish tasks including participate in clinical intake and follow all recommendations, participate in medication management, submit to random drug screens, have an A&D assessment and follow all recommendations, resolve pending legal issues and refrain from incurring any more legal charges, not associate with individuals known to participate in illegal activities, maintain a safe home, have a legal verifiable income, pay child support, and attend regular scheduled visitation with the Child. C. Mitchell testified that since she has been the case manager, Father has not provided proof of completing any of the tasks and responsibilities on the Permanency Plan. She testified that Father had a visit with the Child on January 2, 2015, and one on January 14, 2015. Father has not visited with the Child since January 14, 2015.

C. Mitchell testified that she reviewed the criteria for termination with Father. She stated: "I read everything, single sentence, line-by-line, at his request. . . . When he did not understand, he asked questions. And when I explained and he still didn't understand, I elaborated."

After trial the Juvenile Court entered its detailed order on November 2, 2016, terminating Father's parental rights to the Child after finding and holding, *inter alia*:

5) The Juvenile Court of Hamilton County awarded the Department custody of the subject child on December 19, 2014, and the child has been in foster care continuously since that date. The circumstances of the child's

-14-

situation prevented reasonable efforts from being made prior to the child's removal. The child was adjudicated dependent and neglected on May 27, 2015.

6) At the time of removal, the Respondents, [Mother] and [Father], and the child were staying with the paternal grandmother, [Grandmother]. On December 19, 2014, the Department received a referral alleging drug exposed child. Law enforcement had responded to [Grandmother's] home for suspected drug activity. Upon entering the home, law enforcement found drug paraphernalia in the home. [Mother] admitted to law enforcement that the drug paraphernalia belonged to her. She was arrested that night for possession of drug paraphernalia and was taken into custody. [Father] was drug screened by law enforcement and tested positive for methamphetamine. He admitted that he had just smoked marijuana that night. He had recently been released from jail and was on probation at the time. His mother, [Grandmother], tested positive for benzodiazepines and THC. She could not provide a prescription for the benzodiazepines. The family reported that all their relatives resided in Georgia and could not think of anyone who they could place the child with that night. Therefore, the child was placed in emergency protective custody due to the circumstances of the family and the child at that time.

7) [Father] testified that he is currently incarcerated at the Bradley County Jail and has been there for a little over ninety (90) days. Prior to being transferred to Bradley County, he had been incarcerated in Hamilton County since November 25, 2015. He testified that he has only been out of jail for approximately ninety (90) days since the subject child entered custody. He stipulated to the certified criminal records that were offered as evidence by the Department. Since the child's birth, [Father] has had the following convictions: driving on revoked license, driving under the influence, driving on revoked license, unauthorized use of automobile (joy riding), theft of property (D felony), assault, false reports, evading arrest, theft of property, possession of methamphetamine, theft of property, and evading arrest. In April 2016, [Father] entered a plea of guilty and was sentenced to six (6) years on enhanced state probation with a GPS monitor and a curfew. At the time [Father] incurred these charges, he was on probation in Bradley County for burglary (other than habitation) and theft of property $500-$1,000. A violation of probation hearing was held in Bradley County in August 2016. [Father's] probation was revoked and he was sentenced to serve four (4) years. However, [Father] testified that he expected to be released in eight (8) to nine (9) months.

8) [Father] testified that he is a different man now than he was even a year ago, or when he went into jail. He testified that he last used drugs in January

2015. He told the Court that he is trying to make amends with everyone, and that he wants forgiveness. He is thirty (30) years old and has spent three-fourths (3/4) of his life incarcerated. He is following a religious regimen now. He testified that his soul is filled with failure, and that he is in a much better place personally than he has been in the past. Further, [Father] testified that he has a fiancée, a home, and a job waiting for him upon his release from incarceration.

9) [Father] testified that he knew his responsibilities under the permanency plan, and that he initially signed the plan in January 2015. Specifically, he testified that he was supposed to have a mental health evaluation, alcohol and drug assessment, stable job, stable living, and take care of his pending legal matters. He admitted that he had not accomplished anything on the plan. He tried to take some classes while incarcerated at Silverdale, but testified that he did not have time.

10) [Foster Mom.] testified that her husband, [Foster Dad], is [Father's] first cousin. The subject child has lived in their home since January 2, 2015. There was a one-week period where the child was removed from their home due to miscommunication between two (2) caseworkers. However, the issue was resolved and the child was returned to their home. After the child was removed from their home, the child had issues with separation anxiety. Otherwise, the child is happy and healthy. [Foster Mom] testified that he is exceeding most of his developmental milestones.

11) [Foster Mom] testified that [Father] last saw the child on January 14, 2015, and they only received phone calls from him after that. [Mother's] last visit was on February 11, 2015, and they received a few text messages from her after that in February 2015.

12) [Foster Mom] testified that the paternal grandmother, [Grandmother], has been very helpful in making sure that she and her husband are able to meet all of the child's needs. Specifically, [Foster Mom] testified that they speak with [Grandmother] on at least a weekly basis, and that [Grandmother] checks in to see how the child is doing, how school is going, and health-wise. [Grandmother] brings the child clothes and toys.

13) [Foster Mom] testified that the subject child is slowly developing a relationship with [Father's] other three children who are not in DCS custody. She believes this is healthy for the child, as the child is very excited about his brothers and sister and asks for them quite frequently.

14) The [foster parents] have tried to maintain a relationship with [Mother's] family as well. [Foster Mom] testified that she has cultivated a relationship with her family so that the subject child can develop a relationship with [Mother's] other child who is not in DCS custody.

15) [Foster Mom] testified that the child is bonded to her and her family. She and her husband wish to adopt the child.

16) Paternal grandmother, [Grandmother], testified that she last had contact with her son, [Father], about four (4) days ago. She testified that he told her that he was given nineteen (19) months of credit, and that he would be released in about a year. He also asked her to put money on his book. [Grandmother] testified that [Father] is married and has three (3) children with his estranged wife. She testified that [Father] does not have a relationship with those children or with the subject child. Further, [Grandmother] testified that [Father] has never asked about the subject child or his other children during her phone conversations with him.

17) Prior to the child's removal from her home, [Grandmother] testified that [Father] did not financially support the subject child, and that she paid all the bills. Moreover, [Grandmother] testified that [Father] has not paid child support for his other three children.

18) [Grandmother] testified that she last heard from [Mother] about a year ago, as [Mother] called [Grandmother] and asked if she could stay with her after she got out of Moccasin Bend. However, [Grandmother] told her absolutely no.

19) [Grandmother] testified that the child is thriving in the [foster] home, and that he is happy and healthy there. She believes it is in the child's best interest to be adopted by [the foster parents].

20) DCS Team Leader (TL), Tajuana Mitchell, testified that she has supervised the caseworkers in this matter for the duration of the case. However, she also visits with the subject child at least monthly, and sometimes two (2) to three (3) times a month.

21) TL Mitchell testified that she participated in the initial Child and Family Team Meeting (CFTM) in this case on December 19, 2014. She was present when the first permanency plan was developed. She testified that both [Father and Mother] participated in the development of the initial plan and the plan was explained in detail to [Father and Mother]. Further, [Father and Mother] were given a copy of the Criteria for Termination of Parental Rights, which was signed by both [Father and Mother] on January 13, 2015.

* * *

24) TL Mitchell testified that she visited Respondent, [Father], at Red Bank City Court in December 2015, as she was also trying to engage him in the process again.

25) TL Mitchell testified that the parents have not complied with the responsibilities set forth in the permanency plan prepared for them. She testified that no one has provided her with any documentation of completion of

-17-

the responsibilities on the permanency plan. She testified that [Father and Mother] have not changed their circumstances to make it appropriate for this child to be returned to their care. Further, she testified that the only barrier to permanency at this time is the termination of [Father's and Mother's] parental rights.

26) FSW Connee Mitchell testified that she received professional responsibility for this case on February 16, 2016. . . .

* * *

29) FSW Mitchell testified that she initially met [Father] at the Bradley County Jail on May 17, 2016. She gave him a copy of the most recent permanency plan and went over the plan with him. She gave him releases to sign as well. She testified that [Father's] responsibilities under the plan were as follows: participate in a clinical intake and follow all recommendations; participate in a clinical parenting assessment and follow all recommendations; participate in medication management assessment and follow all recommendations; submit to random drug screens and, if positive, will have an alcohol and drug assessment and follow all recommendations; resolve all pending legal charges; refrain from illegal activities and not incur any new charges; refrain from engaging with individuals who are known to participate in illegal activities; maintain a safe home where the child's needs will be met; have legal verifiable income; pay child support as ordered; attend regular scheduled visitation with the child; maintain contact with the Department; and sign all required releases for case management.

30) FSW Mitchell testified that [Father] had not provided her proof of completion of any of the tasks on the Statement of Responsibilities, but did sign releases as required. Moreover, she did not find documentation of completion of any additional steps on the plan upon being assigned the case.

* * *

33) FSW Mitchell testified that [Father and Mother] had not visited the child since she was assigned the case. However, according to the case file, [Father] had a visit on January 2, 2015 and his last visit was on January 14, 2015. . . .

* * *

35) FSW Mitchell testified that the barriers to reunification are that [Mother's] whereabouts are currently unknown and that [Father] remains incarcerated at this time.

Based upon these findings of fact the Court finds that the following grounds exist for the termination of [Father's and Mother's] parental rights:

**Abandonment by Incarcerated Parent – Wanton Disregard**

The State has established the ground of Abandonment by Incarcerated Parent - Wanton Disregard, pursuant to T.C.A. §§ 36-l-113(g)(l) and 36-l-102(l)(A)(iv), by clear and convincing evidence as to both [Father and Mother].

36) Respondents, [Father] and [Mother], were incarcerated part, or all of, the four (4) months prior to the filing of the petition. . . . [Father] has been incarcerated since November 2015 and is now incarcerated at the Bradley County Jail, serving a four (4) year sentence.

37) The Respondents, [Father] and [Mother], have engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

38) Specifically, since the child's birth, [Father] has had the following convictions: driving on revoked license, driving under the influence, driving on revoked license, unauthorized use of automobile (joy riding), theft of property (D felony), assault, false reports, evading arrest, theft of property, possession of methamphetamine, theft of property, and evading arrest. At the time [Father] incurred these charges, he was already on probation in Bradley County for burglary (other than habitation) and theft of property $500-$1,000. A violation of probation hearing was held in Bradley County in August 2016. [Father's] probation was revoked and he was sentenced to serve four (4) years. Further, at the time of removal, he was drug screened by law enforcement and tested positive for methamphetamine.

\* \* \*

**Substantial Noncompliance with Permanency Plan**

The State has established the ground of Substantial Noncompliance with Permanency Plan, pursuant to T.C.A. §§ 36-l-113(g)(2) and 37-2-403(a)(2), by clear and convincing evidence as to both [Father and Mother].

40) Respondents, [Father] and [Mother], failed to comply in a substantial manner with the Statement of Responsibilities set out in the periodic foster care plan prepared for and signed by them on January 13, 2015.

41) [Father and Mother] participated in the development of the plan. The Department explained to [Father and Mother] those reasonable responsibilities, which are aimed at remedying the conditions, which necessitate foster care placement.

42) Specifically, [Father and Mother] failed to complete any task on their plan, except for signing the necessary releases. . . .

43) The Department made reasonable efforts to help [Father and Mother] satisfy the requirements in the permanency plan by trying to locate and maintain contact with [Father and Mother] and offering assistance to [Father and Mother] in completing the requirements on the plan.

### Best Interest

44) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, in that the Respondents, [Father] and [Mother], have failed to make a lasting adjustment of their circumstances to make it safe and in the children's [sic] best interest to be placed in their care.

45) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, as there is no meaningful relationship between the Respondents, [Father] and [Mother], and the child because the Respondents have not maintained contact or visited with the children [sic] since 2015.

46) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, in that the Respondents, [Father] and [Mother], have not maintained constant or regular visitation with the child.

47) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, as a change of caretakers and home is likely to have a highly negative effect on the child. The child is placed in a stable, pre-adoptive home. The child is thriving in that home and has a strong bond with his foster family and other relatives. [The foster parents] are the only parents that the child knows. [Father] acknowledged that the child is in a good home, and testified that if his rights were terminated, then he would agree that the child should be adopted by his relatives, [the foster parents].

48) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, as the physical environment of [Father's and Mother's] home is unhealthy and unsafe due to criminal activity and the use of alcohol or controlled substances, which renders [Father and Mother] consistently unable to care for the child in a safe and stable manner.

Father appeals the termination of his parental rights to the Child.

## Discussion

Although not stated exactly as such, Father raises one issue on appeal[3]: whether the Juvenile Court erred in finding that the termination of Father's parental rights was in the Child's best interest when the Child has been placed with relatives who plan to maintain a relationship with the Child's paternal family members.

With regard to the termination of parental rights, our Supreme Court has instructed:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[4] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388.

---

[3] In the argument section of his brief on appeal Father argues an additional issue, that DCS improperly prolonged the Child's stay in foster care. Father, however, failed to include this additional issue in his statement of the issues required by Tenn. R. App. P. 27(a)(4). As this Court has explained: "issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals." *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001). As Father did not include this additional issue in his statement of the issues, Father has waived the issue. We note that even if Father had raised this issue properly a resolution of this issue would not change our decision in this case in any way.

[4] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[5] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[6] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in

---

[5] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[6] Tenn. Code Ann. § 36-1-113(i).

conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re: Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted).

Although Father does not raise any issue with regard to the Juvenile Court's findings that grounds to terminate his parental rights had been proven, our Supreme Court has instructed that we must review the Juvenile Court's findings with regard to each ground for termination. We, therefore, begin by considering whether the Juvenile Court erred in finding that clear and convincing evidence had been shown of grounds to terminate Father's parental rights to the Child for abandonment by wanton disregard pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv).

Tennessee Code Ann. § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2016). In pertinent part, Tenn. Code Ann. § 36-1-102(1)(A) provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

* * *

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. If the four-month period immediately preceding the institution of the action or the four-month period immediatley preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without

incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time. Periods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration. Periods of incarceration not discovered by the petitioner and concealed, denied, or forgotten by the parent shall also be counted as periods of nonincarceration. A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment;

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (Supp. 2016).

With regard to this ground for termination, the Juvenile Court specifically found and held:

> 36) Respondents, [Father] and [Mother], were incarcerated part or all of, the four (4) months prior to the filing of the petition. . . . [Father] has been incarcerated since November 2015 and is now incarcerated at the Bradley County Jail, serving a four (4) year sentence.
> 37) The Respondents, [Father] and [Mother], have engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.
> 38) Specifically, since the child's birth, [Father] has had the following convictions: driving on revoked license, driving under the influence, driving on revoked license, unauthorized use of automobile (joy riding), theft of property (D felony), assault, false reports, evading arrest, theft of property, possession of methamphetamine, theft of property, and evading arrest. At the time [Father] incurred these charges, he was already on probation in Bradley County for burglary (other than habitation) and theft of property $500-$1,000. A violation of probation hearing was held in Bradley County in August 2016. [Father's] probation was revoked and he was sentenced to serve four (4) years. Further, at the time of removal, he was drug screened by law enforcement and tested positive for methamphetamine.

The evidence in the record on appeal does not preponderate against the Juvenile Court's finding that Father was incarcerated at the time that DCS filed its petition seeking to terminate his parental rights. Nor does the evidence in the record on appeal preponderate against the Juvenile Court's finding that Father engaged in conduct prior to his incarceration that exhibited a wanton disregard for the welfare of the Child. This

conduct included, in part, Father committing crimes such as driving under the influence, theft, possession of methamphetamine, and evading arrest, among others. The Juvenile Court correctly found that grounds to terminate Father's parental rights for abandonment by wanton disregard had been proven by clear and convincing evidence.

We next consider whether the Juvenile Court erred in finding that clear and convincing evidence had been shown of grounds to terminate Father's parental rights to the Child for substantial failure to comply with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

With regard to this ground for termination, Tenn. Code Ann. § 36-1-113(g)(2) provides:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2016).

With regard to this ground for termination, the Juvenile Court specifically found and held:

> 40) Respondents, [Father] and [Mother], failed to comply in a substantial manner with the Statement of Responsibilities set out in the periodic foster care plan prepared for and signed by them on January 13, 2015.
> 41) [Father and Mother] participated in the development of the plan. The Department explained to [Father and Mother] those reasonable responsibilities, which are aimed at remedying the conditions, which necessitate foster care placement.
> 42) Specifically, [Father and Mother] failed to complete any task on their plan, except for signing the necessary releases. . . .
> 43) The Department made reasonable efforts to help [Father and Mother] satisfy the requirements in the permanency plan by trying to locate and maintain contact with [Father and Mother] and offering assistance to [Father and Mother] in completing the requirements on the plan.

The evidence in the record on appeal does not preponderate against the Juvenile Court's finding that Father failed to comply in a substantial manner with the Permanency Plan. The evidence in the record on appeal shows that Father himself admitted that he was aware of his responsibilities under the Permanency Plan, but that he failed to complete any of the tasks on the Permanency Plan. The Juvenile Court correctly found

-27-

that grounds to terminate Father's parental rights for substantial failure to comply with the Permanency Plan had been proven by clear and convincing evidence.

Finally, we consider the issue raised by Father: whether the Juvenile Court erred in finding that clear and convincing evidence had been shown that it was in the Child's best interest for Father's parental rights to be terminated. When making a determination with regard to best interest, a court is to consider the list of non-exclusive factors contained in Tenn. Code Ann. § 36-1-113(i). As this Court explained in *In re Jaceton B.*:

> Once a ground for termination has been established, the ultimate goal of the proceeding is to ascertain and promote the child's best interests, and to achieve that end courts must consider all relevant factors. *See In re Audrey S.*, 182 S.W.3d at 877; *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The child's best interest must be viewed from the child's, rather than the parent's, perspective. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Ultimately, the relevancy and weight given to each factor depends on the unique facts of each case. *In Audrey S.*, 182 S.W.3d at 878. Depending on the circumstances of the particular parent and particular child in question, the consideration of one factor may determine the outcome of the analysis. *Id.* (citing *White*, 171 S.W.3d at 194).

> The General Assembly has provided a list of factors for courts to consider when determining the best interests of a child. *See* Tenn. Code Ann. § 36–1–113(i). This list is not exhaustive, and a trial court is not required to find the existence of each enumerated factor before it determines that terminating a party's parental rights is in the best interest of the child. *In re M.A.R.*, 183 S.W.3d at 667. Instead, a court is required to weigh both the factors listed in Tenn. Code Ann. § 36–1–113(i) and any other relevant factors to determine whether terminating a parent's rights is in the child's best interest. *Id.*

> Other relevant factors may include the grounds for termination themselves, especially when those grounds involve a long prison sentence. *See In re Dominique L.H.*, 393 S.W.3d at 717 (citing 43 C.J.S. Infants § 22 (2012)). Incarceration creates a lengthy delay in a parent's ability to take custody of his child, and such a delay is a strong indication that termination is in the child's best interests. *See id.* at 718, 720.

*In re Jaceton B.*, No. M2014-01580-COA-R3-PT, 2015 WL 1517779, at **3-4 (Tenn. Ct. App. March 30, 2015), *no appl. perm. appeal filed*.

In his brief on appeal, Father argues that "the circumstances of this case present the question of 'what if?'  What if [Father] does follow through on his conversion?  What if [Father] does make such an adjustment in his circumstances which leads him back to his family, to [the Child's] family?"  Father asserts that the record shows that the foster family intends to raise the Child "as part of the biological family," and that Father, if he follows through "on his declarations of change," will be able to have a relationship with the Child.  Father has missed the point.  The point to be considered is the best interest of the Child in light of all of the relevant factors, not what Father may or may not do at some point in time in the future.

The evidence in the record on appeal shows that Father currently has no relationship whatsoever with the Child and that this reality is a result of deliberate choices made by Father.  The evidence in the record on appeal shows that Father made the choice to repeatedly engage in criminal behavior after the Child was taken into State custody.  Father also made the choice not to complete any of the tasks and responsiblities set forth in the Permanency Plan.  Father has done nothing to demonstrate that he is willing to make the changes necessary for him to regain custody of the Child.  The fact that Father asserts that he wants to change in the future simply is insufficient.  Whether the foster parents intend to raise the Child as part of the biological family or whether they intend to allow Father to have contact with the Child if Father does change his behavior is immaterial to the question of whether it is in the Child's best interest for Father's parental rights to be terminated.

The Juvenile Court considered all of the relevant factors contained in Tenn. Code Ann. § 36-1-113(i) and found, *inter alia*, that Father had failed to make an adjustment to his circumstances to make it safe for the Child to be placed in his care, that Father had no meaningful relationship with the Child, that Father had failed to engage in regular visitation or contact with the Child, that the Child was in a stable pre-adoptive home and was thriving in the foster home, that the Child had developed a strong bond with the foster parents, and that a change in caretakers would be detrimental to the Child's wellbeing.  The evidence in the record on appeal does not preponderate against these findings made by clear and convincing evidence.

Grounds for the termination of Father's parental rights to the Child were proven by clear and convincing evidence.  It also was proven by clear and convincing evidence that it was in the Child's best interest for Father's parental rights to be terminated.  As such, we affirm the Juvenile Court's November 2, 2016 order terminating Father's parental rights to the Child.

## **Conclusion**

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Justin C.

_____
D. MICHAEL SWINEY, CHIEF JUDGE